# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

SHENEQUA MOSS,                          :

    Plaintiff,                          :

                               Case No. 3:14cv00383

vs.                                     :

                               District Judge Walter Herbert Rice

CAROLYN COLVIN,                         :       Chief Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,                :

    Defendant.                          :

# REPORT AND RECOMMENDATIONS[1]

## I.    <u>Introduction</u>

Plaintiff Shenequa Moss brings this case challenging the Social Security Administration's denial of her applications for Supplemental Security Income and Disability Insurance Benefits. She filed (protectively) for benefits on October 13, 2011. She asserted that beginning on December 1, 2010, she could no longer work and was therefore under a disability due to her health problems, including Hodgkin's Lymphoma (Stage II) and severe depression. (Doc. #6, *PageID* #339). The Social Security Administration denied her applications mainly through Administrative Law Judge (ALJ) Elizabeth A. Motta's decision that she was not under a benefits-qualifying disability.

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff brings this case challenging ALJ Motta's non-disability decision.  The case is before the Court upon Plaintiff's Statement of Errors (Doc. #10), the Commissioner's Memorandum in Opposition (Doc. #13), Plaintiff's Reply (Doc. #14), the administrative record (Doc. #6), and the record as a whole.

Plaintiff seeks an Order overturning the ALJ's non-disability decision and remanding the case to the Social Security Administration for payment of benefits.  The Commissioner seeks an affirmance of the ALJ's decision.

## II.    <u>Background</u>

### A.      <u>Plaintiff's Vocational Profile and Testimony</u>

Plaintiff's age at the time she allegedly became disabled, and at the time of the ALJ's decision, placed her within the Social Security Administration's definition of a younger person.  She has an eleventh grade education and worked as a nail technician and an assembly/production worker.

During a hearing before ALJ Motta, Plaintiff testified that she stopped working her last job (she was self-employed as a nail technician) in December 2010 because she was diagnosed with Hodgkin's lymphoma.  After her diagnosis, she attempted to do a little work without success.  (Doc. #6, *PageID* #74).  She explained, "I had to go to a lot of chemo-therapy and radiation, and it interfered with me keeping my schedule."  *Id*. at 73.  She further explained that the treatments she received caused her a lot of nausea and vomiting.  *Id*. at 74, 84.  She was also disoriented, confused, and "depressed a lot."  *Id*. at 75.  The radiation

2

treatments "drained" Plaintiff, leaving her without energy.  *Id*. at 84.  Plaintiff completed chemotherapy and radiation treatments in January 2012.  Since then, the Hodgkin's lymphoma had been in remission, but some negative effects of the treatment remain.  *Id*. at 74.

Since having chemotherapy and radiation treatments, Plaintiff has struggled with back pain, severe headaches, and numbness in her hands, wrists, and arms.  *Id*. at 76-77.  Her severe headaches happen about twice a week and last between 60 and 90 minutes.  She lies down when she gets a headache.  If that doesn't help she will take medication.  She easily becomes short of breath with physical activity.

Plaintiff testified that she became extremely depressed during the cancer treatment, and her depression persisted even after her cancer went into remission.  Around the time of the ALJ's hearing (April 2013), Plaintiff was "feeling just a lot of irritability [and] worthlessness.  Just ... trying to see where my life is going to go ...."  *Id*.  She continued, "You know a lot of my dreams and aspirations have kind of declined since the treatment...." *Id*.  She feels worthless and irritable.  She is persistently fatigued and lonely at times.  *Id*. at 75.   Her other reported symptoms of depression include crying spells, problems being around others, and diminished memory.  *Id*. at 79.  She has trouble remembering sometimes, which embarrasses her, and needs a lot of reminders for things.  *Id*. at 79-80.  Plaintiff also has anxiety and experiences panic attacks where her heart races and she becomes short of breath.  *Id*. at 78.  She has three to four of these attacks each week.  *Id*. at 78-79.

3

As to her daily activities, Plaintiff explained that she has a hard time finishing the chores she starts, and she uses her phone to remind her of necessary tasks. *Id*. at 79-80. She has good days where she does some household cleaning or will even go to the grocery store during times when the store is less crowded. *Id*. at 80-81. Yet, on bad days she mostly just lies in bed. *Id*. at 81. When invited to activities by friends or family, she often declines. *Id*. at 86. She does not go anyplace – like church or club activities – on a regular basis. She tries to go to church one or two times per month. *Id*.

### B.     Medical Records And Opinions

In February 2010, Plaintiff began receiving primary care treatment through Dr. Shaw at Schear Family Practice. (Doc. #6, *PageID* #s 598-600). At an appointment with Dr. Shaw in March 2010, Plaintiff reported having a headache, an anxiety attack, and difficulty sleeping. *Id*. at 595. That same month, she went to the emergency room and reported a constant, acute headache. *Id*. at 429-30. There was concern that she might have been suffering a brain bleed, but a CT of her brain was negative. *Id*. at 434. She was provided medication and discharged. Id.

At two appointments in early April 2010, Plaintiff again reported to Dr. Shaw that she was having headaches. Anxiety attacks, headaches, and difficulty sleeping were also recorded during appointments with Dr. Shaw in May and June 2010. *Id*. at 589-90, 591-92.

On April 27, 2010, Plaintiff was referred to Dr. Wilcher, a surgeon, to address a mass on the left side of her neck. *Id*. at 444-45. Dr. Wilcher biopsed a sample of the mass, which

4

unfortunately revealed that the mass was an inflamed lymph node with evidence of invasive Hodgkin's disease.  *Id*. at 443.  After surgically excising the lymph node on June 9, 2010, analysis confirmed that Plaintiff was indeed suffering from Hodgkin's lymphoma.  *Id*. at 438, 440-41.  Dr. Wilcher discharged Plaintiff into the care of oncologist Dr. Jilani.  *Id*. at 438.

Progress notes from Dr. Jilani's office track Plaintiff's radiation and chemotherapy treatments.  Her chemotherapy port was surgically implanted in June 2010.  *Id*. at 520.  In July 2010, a consulting physician, Dr. Paessun, wrote to Dr. Jalani.  She noted, "As you may recall, this is a 38 year old woman who presents with a clinical Stage of IIB, unfavorable, non bulky, nodular sclerosing Hodgkin's disease involving the left supraclavicular and mediastinal area."  *Id*. at 567.  After discussing treatment options with Plaintiff, they decided to proceed with radiation after the chemotherapy was completed.  *Id*.

In August, 2010, Plaintiff was having "some problems with nausea," including "breakthrough" episodes, as well as problems with "some chemo-induced fatigue."  *Id*. at 490, 492.  In October 2010, Plaintiff reported "a little bit more increased nausea," and "a few episodes of a little bit more fatigue" due to the chemotherapy.  *Id*. at 487.  That same month, CT scans of Plaintiff's neck revealed that her lymph nodes were slightly prominent on the imaging, however, the associated nodes remained stable.  *Id*. at 475-82.

On November 4, 2010, Deb Brown of Dr. Jilani's office completed a brief questionnaire for the Social Security Administration.  *Id*. at 468-69.  In the questionnaire,

Ms. Brown indicated that Plaintiff was suffering from Stage IIB Hodgkin's disease for which she was receiving radiation and chemotherapy. *Id*. 469. Deb Brown noted that Plaintiff's response to treatments "looks favorable, but side effects "have been disabling." *Id*.

Plaintiff was examined by state agency psychological consultant Dr. Kramer in December 2010. *Id*. at 556-62. She told Dr. Kramer that she had chronic fatigue and shortness of breath secondary to her ongoing chemotherapy treatments. She reported symptoms of depression including frequent crying, difficulty sleeping, and social isolation. Dr. Kramer observed that Plaintiff's affect was depressed, and she was occasionally tearful during the examination. *Id*. at 558. Ultimately, he diagnosed her with an adjustment disorder with a depressed mood and opined that the same both occasioned at least mild impairment in her functioning and would limit her to simple repetitive tasks. *Id*. at 561.

From December 15, 2010 through January 13, 2011, Plaintiff received 17 administrations of radiation to the left side of her neck and chest. *Id*. at 566. At an oncology follow-up with Dr. Paessun on February 24, 2011, Plaintiff complained of stiffness and soreness about her left shoulder. Dr. Passeun noted, "She denies actual weakness of the left upper extremity." *Id*. at 564. In her assessment, Dr. Passeu believed that Plaintiff "has healed well from the acute reactions of radiation...." *Id*. at 565.

At a September 2011 appointment with Dr. Shaw, Plaintiff exhibited a flat affect and reported increasing anxiety, problems sleeping, and difficulty being around others. *Id*. at

6

572.  In October 2011, Plaintiff saw her oncologist Dr. Jilani.  He noted "Overall she is doing fairly well on followup."  *Id*. at 614.  She told Dr. Jilani that she was experiencing irregularity in her menstrual cycle and episodic hot flashes accompanied by sweating.  *Id*.  In December 2011, Dr. Jalani documented that Plaintiff had no evidence of Hodgkin's lymphoma, "and clinically she is in remission."  *Id*. at 757.

On November 15, 2011, Jonathan Hertz of the Flexman Clinic completed a brief questionnaire at the request of Social Security.  *Id*. at 602-04.  He identified Plaintiff's diagnosis as an adjustment disorder and noted that her symptoms included a depressed mood, difficulty sleeping, and irritability.  *Id*. at 603.  He noted that his ability to appraise Plaintiff's specific limitation was limited because he had only seen Plaintiff for two therapy sessions.  *Id*.

On December 19, 2011, state agency consultant Dr. Caldwell reviewed Plaintiff's records.  She opined that Plaintiff could perform a reduced range of light work.  She further opined that Plaintiff could not perform work involving hazards due to Hodgkin's lymphoma.  *Id*. at 126-27.  In June 2012, Dr. Bertani opined that Plaintiff could perform the full range of medium work.  *Id*. at 153-54.  Dr. Bertani appears to have provided no substantive explanation for this conclusion.  *See id*.

Plaintiff underwent a psychological evaluation with a second Social Security consultant, Dr. Bonds, in January 2012.  *Id*. at 616-23.  Plaintiff complained to Dr. Bonds of severe depression and anxiety.  She also has panic attacks.  *Id*. at 616.  She reported ongoing

problems with pain, muscle spasms, and headaches related to her chemotherapy and

radiation.  *Id*. at 618.  Dr. Bonds noted:

> [Plaintiff's] mood seemed mildly depressed and affect was broad and
> appropriate to thought content....  She did not express marked feelings of
> hopelessness, helplessness, worthlessness or guilt.  She stated that she thought
> about suicide once but she has never tried it. She reported having problems
> with controlling her temper.  She indicated that she easily becomes angry and is
> frequently argumentative but not usually physically aggressive. [She] stated
> that she has mood swings.  Sometimes she is in a great mood and at other times
> she is crying and screaming....  She stated she has trouble sleeping bu this has
> improved since she has ben on the sleeping pills....

*Id*. at 619.  According to Dr. Bonds, Plaintiff did not display overt signs of anxiety such as

rocking or fidgeting.  She stated that she is often tense, nervous, and anxious....  She

sometimes has panic attacks in which she will become nervous and break into a sweat...."  *Id*.

at 620.  As to her daily activities, Plaintiff explained to Dr. Bonds that she lies down after

doing household chores, drives as little as possible, and tries to grocery shop only during

times when the store is not crowded.  *Id*. at 620-21.

Dr. Bonds diagnosed Plaintiff with depressive disorder and anxiety disorder.  *Id*. at

621.  In terms of her functional limitations, Dr. Bond's opined that Plaintiff may "have some

difficulties working around others, taking criticism, and handling interpersonal problems that

tend to occur at work."  *Id.*  Dr. Bonds also opined:

> [Plaintiff] has low frustration tolerance and feels uncomfortable around
> many people. She may have some difficulty working around others, dealing
> with criticism and handling pressures for productivity.  She may work best
> when she works alone and at her own pace.

*Id*. at 623.

Following Dr. Bonds' examination, psychiatrist Dr. Hoyle reviewed the record at the state agency's request.  *Id*. at 128-30.  Dr. Hoyle opined that Plaintiff's mental impairments would restrict her to simple, repetitive tasks without "strict production standards or schedules."  *Id* at 129.  Dr. Hoyle further believed that Plaintiff was precluded from tasks requiring a "rapid or consistent pace."  *Id*.  In terms of social limitations, Dr. Hoyle opined, "[Plaintiff] has problems relating to others, and would likely have problems relating to supervisors or coworkers without distracting them or being argumentative.  [She] can engage appropriately in occasional, simple social interactions.  She would probably do best in a setting where she can work alone."  *Id*.  Dr. Hoyle's opinions were subsequently affirmed verbatim by a second state agency consultant, psychologist Dr. Lewin.  *Id*. at 156.

From January 30, 2012 through the date of her administrative hearing, Plaintiff received mental health treatment through Day-Mont Behavioral Healthcare.  *Id*. at 637-64, 688-731,  797-818).  Her diagnoses at Day-Mont included a depressive disorder, an adjustment disorder with mixed anxiety, and alcohol abuse.  *Id*. at 646, 652, 714, 721, 798, 817.

During appointments at Day-Mont, Plaintiff reported mental health symptoms associated with depression and anxiety which were lessened only somewhat through treatment.  *Id*. at 641, 647, 653, 688, 709, 716, 797, 804, 811.  These included, but were not limited to, decreased sleep, panic attacks, diminished energy, problems being around others, and tearful spells.  She also reported having more "bad days" than good.  *Id*. at 731.

In February 2013, Dr. Shaw completed a one-page "Medical statement regarding disability for Social Security disability claim." *Id.* at 777.  He indicated that Plaintiff's symptoms consisted of "back pain, generalized arthralgias, cough, and dyspnea." *Id.*  He recognized that Plaintiff's medical history included Hodgkin's lymphoma, modular sclerosis, hypertension, arthralgias, and angina.  His most recent findings included, anxiety and paraspinal decreased range of motion and spasm.  Dr. Shaw answered yes, when asked, "Does your patient have any significant problems with anxiety and/or depression which would markedly limited her ability to withstand the stresses and pressures of ordinary work activity?" *Id.*  He then noted Plaintiff was "followed at Daymont West by psychiatry." *Id.*  He also opined that Plaintiff had no work capacity.

A detailed description of the remaining medical records is unnecessary because the undersigned has reviewed the entire administrative record and because Plaintiff, Defendant, and the ALJ have discussed and referred to the pertinent records in great detail.

### III.    "Disability" Defined <br> and ALJ Motta's Decision

To be eligible for Disability Insurance Benefits or Supplemental Security Income a claimant must be under a "disability" as the term is defined by the Social Security Act.  *See* 42 U.S.C. §§423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both benefit programs.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the

applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70.

As noted previously, it fell to ALJ Motta to evaluate the evidence connected to Plaintiff's benefit applications.  She did so by considering each of the five sequential steps set forth in the Social Security regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[2] The ALJ concluded in the main:

1.  Plaintiff had not worked a substantial paid job since the date of her claimed disability onset (December 1, 2010).

2.  She the severe impairments of "Hodgkin's lymphoma in remission post treatment, an affective disorder, an anxiety-related disorder, and a history of alcohol abuse."  (Doc. #6, *PageID* #45).

3.  She does not have an impairment that satisfies the criteria needed to establish a disability under the Listing of Impairments.[3]

4.  She could not perform her past relevant work as a nail technician or an assembly/production worker.  *Id*. at 57.  The ALJ based this conclusion on her assessment of Plaintiff's residual functional capacity, or the most she could do in a work setting despite her limitations.[4]  The ALJ found:

    [Plaintiff] has the residual functional capacity to lift up to 20 pounds occasionally and 10 pounds frequently; standing and

---

[2] The remaining citations to the regulations will identify the pertinent Disability Insurance Benefits regulations with full knowledge of the corresponding Supplemental Security Income regulations.

[3] The Commissioner's Listing of Impairments is found at 20 C.F.R. Part 404, Subpart P, Appendix 1.

[4] *See Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

walking limited to a combined total of four hours in an eight-hour workday; only occasional postural activities, such as climbing stairs/ramps, balancing, stooping, kneeling, crouching or crawling, no climbing ropes, ladders or scaffolds; no exposure to hazards, such as moving or dangerous machinery or working at unprotected heights; an indoor, clean air, temperature controlled environment; simple, repetitive tasks; low stress work with no strict production quotas or fast pace and few changes in the work setting; and only occasional contact with the public, coworkers, and supervisors.

*Id*. at 48.

5.   She could perform a significant number of jobs that exist in the national economy. *Id*. at 57.

ALJ Motta's findings led to her conclusion (as previously noted) that Plaintiff was not under a benefits-qualifying disability from December 1, 2010.

## IV.   Judicial Review

The Social Security Administration's denial of Plaintiff's applications for benefits – here, embodied in ALJ Motta's decision – is subject to judicial review along two lines: whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's findings.  *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see Bowen v. Comm'r of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).  Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.

The substantial-evidence review does not ask whether the Court agrees or

disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Social. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, substantial evidence supports the ALJ's factual findings when "a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

## V. Discussion

### A. Plaintiff's Contentions and Applicable Standards

Plaintiff contends that the ALJ purports to defer to the opinions of the state agency's psychological consultants but fails to adopt, without explanation, many of the restrictions they identified. Plaintiff also contends that the ALJ fails to adequately weigh the opinion of treating source Dr. Shaw and improperly failed to explain why she placed great weight on the opinions of state agency reviewer Dr. Caldwell.

Social Security regulations recognize several different types of medical sources: treating physicians and psychologists, nontreating yet examining physicians and psychologists, and nontreating/record-reviewing physicians and psychologists. *Gayheart v. Comm'r Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed

13

an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citations omitted).[5] To effect this hierarchy, the Regulations adopt

the treating physician rule. The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with other substantial evidence in [a claimant's] case record."

*Gayheart*, 710 F.3d at 376 (citation omitted); *see Gentry v. Comm'r Social Sec*, 741 F.3d 708,

723 (6th Cir. 2014). If both conditions do not exist, the ALJ's review must continue:

> When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.

*Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The regulations also require ALJs to provide "good reasons" for the weight placed

upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons"

requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a

---

[5] The Social Security Administration has re-lettered 20 C.F.R. §416.927 without altering the treating physician rule or other legal standards  The re-lettered version applies to decisions, like ALJ Motta's, that issued on or after April 1, 2012.

treating source's medical opinions." *Id*. (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188 at *5 (1996)).  The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight.  *Id*.  Substantial evidence must support the reasons provided by the ALJ for the weight, if any, placed on a treating medical source's opinions.  *Id*.

## B.   Dr. Shaw

Although Plaintiff first challenges the ALJ's purported deferral to the opinions provided by the state agency psychological consultants, the present review begins with the ALJ's evaluation of treating physician Dr. Shaw's opinions so as to better track the potential significance of the treating physician rule.  Contrary to Plaintiff's arguments, substantial evidence supports the ALJ's evaluation of, and decision to place little weight on, Dr. Shaw's opinions.  Dr. Shaw's opinions appear in a one-page form he completed in February 2013. The only portion of the information Dr. Shaw provided in February 2013 that constitutes an opinion is his response to a "yes or no" question and a "circle the answer" multiple-choice question.  *See* Doc. #6, *PageID* #777.  When asked on the form whether Plaintiff had "any significant problems with anxiety and/or depression [that] would markedly limit her ability to withstand the stresses and pressures of ordinary work activity[,]" Dr. Shaw checked the "Yes" response.  *Id*.  But, when asked to explain, he provided no meaningful information and stated only that Plaintiff was "followed at [Day-Mont] by psychiatry."  *See id*.  Asked to identify Plaintiff's work capacity by circling either "full-time," "part-time," or "none," Dr. Shaw circled "none" without providing a single word of comment or explanation.  Given the

15

dearth of explanation or reference to supporting evidence, the ALJ did not err in placing little weight on Dr. Shaw's opinions. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 652 (6th Cir. 2006) (en banc) ("[t]his court has consistently stated that the [Commissioner] is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence." (citation omitted)); *cf. Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) ("Although the regulations instruct an ALJ to consider [certain] factors, they expressly require only that the ALJ's decision include 'good reasons ... for the weight ... give[n] [to the] treating source's opinion' not an exhaustive factor-by-factor analysis." (citation omitted)).

Additionally, the ALJ noted that the record contains no objective medical evidence to support the contention that Plaintiff's ability to tolerate workplace stress was markedly limited.  The treatment notes from Plaintiff's treating psychiatrist, Dr. Cheng, contradict that assertion.  (Doc. #6, *PageID* #s 641-60, 709-22, 811-17).  For example, as the ALJ noted, in July of 2012, Plaintiff reported continued anxiety symptoms but she reported further reduction in depressed mood and related symptoms.  *See id*. at 53, 641. Dr. Cheng found Plaintiff with anxious mood and constricted affect but he noted she was "still with no history of clinical panic attacks or excessive generalized worrying," and he found her cooperative, with average demeanor and activity level, logical thought process, fair insight, and intact judgment.  *Id*. at 641-43.  Her speech was clear and she was free of any cognitive impairment

16

and reported no hallucinations or delusions.  *Id*. at 642-43.  Likewise, in January 2013, Plaintiff "presented at her overall psychiatric baseline, denied relapse for clinical depressive mood or vegetative Sx's [symptoms](no anhedonia/hopelessness, stable sleep/appetite ...) and had no significant associated clinical anxiety-spectrum Sx's (no panicky feelings, no somatic focus, less agitated tension)." *Id*. at 811.  She also denied any side effects and, except for constricted affect, all findings were normal, including normal mood.  *Id*. at 812-13.

The treating therapists' notes, discussed by the ALJ, *id*. at 53, also contradict Dr. Shaw's opinions about Plaintiff's markedly limited ability to withstand the stress and pressures of ordinary work activity.  When therapist Ms. Norwood initially met Plaintiff, she noted normal findings, including logical thought process, average mood, full affect, cooperative behavior, average demeanor and eye contact, clear speech, and no reported cognitive impairment, delusions, or thoughts of self-harm.  *Id*. at 697-98.  Later, Ms. Norwood and Plaintiff's other counselors repeatedly noted those same normal findings, with very few exceptions.  *See id*. at 637-40, 661-64, 701-08, 723-31, 801-10.

The assessments by Drs. Kramer and Bonds lend further support to the ALJ's decision to give little weight to Dr. Shaw's opinion.  As the ALJ noted, Plaintiff told Dr. Kramer that her ability to work was related primarily to physical impairments and was vague about "how her psychological problems would affect her ability to work," despite repeated questioning.  *Id*. at 51, 556.  The ALJ also observed that Plaintiff reported being more withdrawn than in

17

the past, but she did not indicate any problems interacting with the public.  *Id*. at 51, 557.  On

mental status examination, she was fully oriented and exhibited adequate memory and no

evidence of any formal thought disorder; her "social skills and ability to establish rapport

were adequate" and she displayed average intelligence.  *Id*. at 52, 557-59.  While she

reported worrying about her financial and physical problems, she "displayed no overt

anxiety.  *Id*. at 52, 558.

Similarly, at the second consultative examination, Dr. Bonds found Plaintiff alert,

oriented, and cooperative, with "mildly depressed" mood, broad and appropriate affect, and

logical, coherent, and goal-directed thought processes.  *Id*. at 52, 619-20.  Her speech was

clear, understandable, and normal in rate and tone; her psychomotor activity was likewise

normal.  *Id*. at 52, 619.  She exhibited no overt signs of anxiety and Dr. Bonds saw no

evidence of hallucinations, delusions, paranoia," or other disturbances.  *Id*. at 619-20.

Plaintiff "displayed some difficulties with short-term memory," but her "attention and

concentration were satisfactory."  *Id*. at 622.  She also exhibited insight and "adequate

judgment and reasoning abilities[,]" although she did display frustration during the cognitive

screening and became more anxious.  *Id*. at 620.

Lastly, given the patent deficiencies in Dr. Shaw's opinion – particularly, his

omission of any meaningful explanation or reference to supporting medical evidence – if the

ALJ had committed a procedural error when reviewing Dr. Shaw's opinions, such error was

harmless.  *Cf. Wilson*, 578 F.3d at 547 ("if a treating physician's opinion is so patently

deficient that the Commissioner could not possibly credit it, a failure to observe

§404.1527(d)(2) may not warrant reversal.").

Accordingly, Plaintiff's challenges to the ALJ's evaluation of Dr. Shaw's opinions

lack merit.

**C.** **State Agency Psychological Consultants**

Turning to the state agency psychological Consultants, the same evidence that

undermines Dr. Shaw's opinion, discussed previously, supports the opinions of Drs. Hoyle

and Lewin and the opinion of examining consultant Dr. Bonds, on which Drs. Hoyle and

Lewin relied. *See* Doc. #6, *PageID* at 123, 125, 152-56, 622-23. Additionally, because Drs.

Hoyle and Lewin reviewed and cited far more detailed and comprehensive evidence about

Plaintiff's mental impairment than Dr. Shaw did, their opinions are better supported by

pertinent evidence than Dr. Shaw's opinion, and, in turn, were due more weight. Dr. Hoyle

reviewed all of the medical evidence then extant in the case file, including the reports of the

two consultative psychiatric evaluations by Drs. Kramer and Bonds – examining

psychologists specializing in mental impairment– and the treatment notes from the Flexman

Clinic. *Id*. at 123, 125. Likewise, Dr. Lewin reviewed the same psychiatric evaluation

reports. *Id*. at 149-50, 153. In contrast, the one-page document completed by Dr. Shaw

contains no meaningful supporting information. *See id*. at 777. And, while Dr. Shaw knew

Plaintiff was receiving psychiatric care, there is no indication that he actually saw any

treatment notes from Plaintiff's treating psychiatrist or counselors. The specialization factor

19

also favored placing more weight on the opinions of Drs. Hoyle, Lewin, and Bonds than Dr.

Shaw's because all three consultants, unlike Dr. Shaw, are mental-health specialists.  See 20

C.F.R. § 404.1527(c)(5).

Plaintiff argues that the ALJ failed to adopt many of the limitations posited by Drs.

Bonds, Hoyle, and Lewin without explaining why she did not include them in Plaintiff's

residual functional capacity.  This is incorrect. The ALJ's assessment of Plaintiff's residual

functional capacity encompasses the entire opinion of each of these consultants.  *See id*. at

48, 128-29, 155-56, 622-23.  Specifically, Dr. Bonds opined Plaintiff might have "some

difficulties working around others, taking criticism, and handling interpersonal problems ..."

in a work setting and might "work best when she works alone and at her own pace."  *Id*. at

622-23.  Both Dr. Hoyle and Dr. Lewin opined that Plaintiff had the capacity to perform

simple, repetitive tasks free of "strict production quotas or schedules" and not requiring a

"rapid or consistent pace ...."  *Id*. at 128-29, 154-56.  Further, these consultants concluded

that Plaintiff could "engage appropriately in occasional, simple social interactions," and

"would probably do best in settings where she [could] work alone."  *Id*.   In turn, the ALJ

included in Plaintiff's residual functional capacity these limitations: "simple, repetitive tasks;

low stress work with no strict production quotas or fast pace and few changes in the work

setting; and only occasional contact with the public, co-workers, and supervisors."  *Id*. at 48.

Such limitations clearly accounted for the limitations articulated by the three consultants.

Although these consultants suggested that Plaintiff might possibly perform at her best when

working alone, none of them suggested Plaintiff could not tolerate occasional interaction with others and, in fact, Drs. Hoyle and Lewin expressly opined that she could engage in "simple social interactions" occasionally. *See id*. at 128-29, 154-56.

Plaintiff relies on Dr. Bonds's observation that she "seem[ed] to take frequent rest breaks," and Plaintiff suggests that Dr. Bonds was actually opining Plaintiff required frequent breaks. *Id*. at 867. However, this part of Dr. Bonds report merely noted Plaintiff's subjective reports. "[A] doctor's report that merely repeats the patient's assertions is not credible, objective medical evidence." *Mitchell v. Comm'r of Soc. Sec*., 330 F. App'x 563, 569 (6th Cir. 2009). Dr. Bonds's mere observation does not constitute a medical opinion or a functional limitation that was entitled to weight. *See Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007) ("Since Dr. Naum made no medical judgments, the ALJ had no duty to give such observations controlling weight or provide good reasons for not doing so."). Indeed, the only thing Dr. Bonds actually opined was that Plaintiff might "have some difficulties working around others, taking criticism, and handling interpersonal problems that tend to occur at work" and therefore "may work best when [working] alone and at her own pace." *Id*. at 622-23. Thus, in limiting Plaintiff to "only occasional contact with the public, co-workers, and supervisors[,]" the ALJ took into account all of Dr. Bonds' opinion. *See id*. at 50.

### D. Dr. Caldwell

The Commissioner acknowledges that the ALJ did not elaborate about her decision to place great weight on the opinions of State agency medical consultant Dr. Caldwell. The

Commissioner is correct, however, that placing great weight on Dr. Caldwell's opinions was reasonable given the absence of a contrary opinion by Dr. Shaw that was due controlling or deferential weight and in the absence of a contrary opinion by another treating medical source. *Cf. Watts v. Comm'r of Soc. Sec.*, 179 F. App'x 290, 294 (6th Cir. 2006) ("[N]one of Watts's treating doctors during the relevant period ... made detailed functional capacity analyses, which leaves the functional capacity forms from the medical reviewers as the best evidence."). The ALJ's decision, moreover, is sufficiently detailed to reveal that she reviewed the evidence with care, and she cited ample evidence supporting Dr. Caldwell's opinion that Plaintiff could perform a range of light work. *See* Doc. #6, *PageID* #s 50-51 (and evidence discussed therein). For example, the physical examinations at Plaintiff's oncology follow-ups routinely produced normal findings, and her oncologist noted that she was doing well. *Id.* at 50-51, 614, 668, 752, 846. Even Dr. Shaw's treatment notes provide some support for Dr. Caldwell's conclusion. Dr. Shaw's notes, covering 30 visits over the course of three years, consistently include few specific findings and primarily reflect little more than basic examinations and medication refills as needed. *See id.* at 571-98, 665-78. Likewise, the results of Plaintiff's stress echocardiogram and EKG were, as the ALJ noted, "negative for any significant heart disease[ ]" and Plaintiff was "cleared to begin an exercise regimen. *Id.* at 51, 823. And, as previously discussed, Dr. Shaw did not provide a medical opinion concerning Plaintiff's physical capacity for work that was due controlling or deferential weight. The most he provided was an opinion about the effects of Plaintiff's

22

mental impairment, which for the reasons discussed above, was not due controlling or deferential weight. *See id*. at 777. Consequently, Dr. Caldwell's opinion about Plaintiff's physical work abilities and limitations did not contradict Dr. Shaw in any way.

Accordingly, Plaintiff's challenges to the ALJ's reliance on Dr. Caldwell's opinions lack merit.

### E.  Plaintiff's Remaining Contentions

Plaintiff points out that the ALJ held that she, the ALJ, "cannot reasonable infer that the claimant stopped working on the alleged onset date due solely to her impairments." (Doc. #10, *PageID* at 972 (quoting Doc. #6, *PageID* at 54). Plaintiff contends that this finding was manifestly absurd and patently unsupported by the record. Plaintiff is correct to the extent that this paragraph of the ALJ's decision implies Plaintiff did not stop working on her claimed disability onset date solely because of her Hodgkin's lymphoma. *See* Doc. 6, *PageID* #54. To be clear: The evidence of record establishes that Plaintiff stopped working when she was diagnosed with Hodgkin's lymphoma and began a course of chemotherapy treatment, followed by radiation treatments. The ALJ, however, rather than considering Plaintiff's activities at the time of her onset date, the ALJ discussed evidence in January 2012, more than a year later. Based on the ALJ's consideration of this evidence, her focus was more on Plaintiff's activities and lack of employment throughout the relevant period, rather than on her initial cessation of work on her alleged onset date. It was within the ALJ's discretion to consider such evidence. Such evidence, moreover, could reasonably tend to

support the ALJ's conclusion that Plaintiff's continued lack of employment – well after her alleged disability onset date – "is not necessarily due to any disabling impairments ...." *Id.* at 54.

Plaintiff lastly contends that the ALJ's findings about her daily activities and credibility are unsupported and unreasonable. The ALJ found that Plaintiff's ability to engage in certain daily activities was inconsistent with her statements about the extent of her limitations. *Id.* The Commissioner is correct that the ALJ's finding was supported by evidence, reasonable, and did not "remove all substantive context" from Plaintiff's self-reports. *See id.* at 49, 873. The ALJ itemized some of Plaintiff's activities based on her testimony and on other reports. For instance, the ALJ noted that Plaintiff "goes to some of her daughter's school events but not as many as she did prior to her illness." *Id.* at 49. That comports with Plaintiff's testimony that she attends her daughter's school events "maybe once or twice a month[,]" and with what Plaintiff told a consultative examiner. *Id.* at 87, 559. Similarly, the ALJ stated Plaintiff "testified that she is able to cook her own meals" – she testified that she was able to prepare some meals for herself – and she told a consultative examiner that she did "some housework such as cooking and laundry." *Id.* at 49, 85, 559. Likewise, the ALJ noted Plaintiff testified that she was able "to go downstairs in her apartment building to do laundry" and Plaintiff did in fact state that she went downstairs to the basement of her apartment to start the laundry, returning to the basement later to "get the laundry out." *Id.* at 49, 79-80, 85-86.

24

Perhaps more significantly, the ALJ cited the consultative examiners' reports about Plaintiff's daily activities, noting she spent time getting "her daughter ready for school in the morning," was able to drive occasionally, enjoyed spending time with her daughter, had "a few friends and a support system for herself[,]" and attended her daughter's school events, although fewer than before. *Id.* at 49, 559. According to one consultative examiner, Plaintiff functioned independently "overall" but said "that her style of life [was] significantly reduced from what it had been in the past." *Id.* at 49, 559. Similarly, as the ALJ noted, Plaintiff told another consultative examiner that she "sometimes" cleaned the house, was able to drive but drove "as little as possible," did her laundry at home, and went "to the grocery store but trie[d] to go during the times when it [was] least crowded." *Id.* at 49, 620-21. None of these statements by the ALJ mischaracterized Plaintiff's testimony or reports. For these reasons, the ALJ's findings concerning Plaintiff's daily activities and credibility are due great weight and deference. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *cf. Winslow v. Comm'r of Soc. Sec.*, 566 F. App'x 418, 422 (6th Cir. 2014) (substantial evidence supported ALJ's determination that claimant's testimony was not fully credible because "testimony conflicted with the majority of medical evidence in the record and the credible medical-source opinions.").

### IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability finding be affirmed; and

2.     The case be terminated on the docket of this Court.


February 3, 2016

                                     s/Sharon L. Ovington
                                    Sharon L. Ovington
                            Chief United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).